UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JEFFREY A. MELLO,

                                    Plaintiff,                    1:15-CV-0013
                                                                  (GTS/ATB)
v.

SIENA COLLEGE,

                                    Defendant.
_____

APPEARANCES:                                          OF COUNSEL:

GLEASON, DUNN, WALSH & O'SHEA                          LISA F. JOSLIN, ESQ.
   Counsel for Plaintiff
40 Beaver Street
Albany, New York 12207

TOBIN & DEMPF, LLP                                     MICHAEL L. COSTELLO, ESQ.
   Counsel for Defendant
33 Elk Street
Albany, New York 12207

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment discrimination action filed by Jeffrey

Mello ("Plaintiff") against Siena College ("Defendant"), is Defendant's second motion for

summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 41.) For the reasons set forth

below, Defendant's motion is granted.

# I.     RELEVANT BACKGROUND

## A.     Plaintiffs' Amended Complaint

Plaintiff's Amended Complaint asserts the following five claims: (1) a claim that Defendant retaliated against Plaintiff for reporting and complaining of unlawful employment practices, in violation of N.Y. Exec. Law ("NYSHRL") § 296(1)(e); (2) a claim that Defendant breached Plaintiff's employment contract when it reduced his salary after he was removed from his position as Dean of the School of Business; (3) a claim that Defendant retaliated against Plaintiff by removing him from his position as Dean of the School of Business and reducing his salary after he complained of unlawful employment practices, in violation of Title VII, 42 U.S.C. § 2000e-3(a); (4) a claim that Defendant violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), as modified by the Equal Pay Act ("EPA") of 1963, 29 U.S.C. § 206(d) *et seq.*, when it retaliated against Plaintiff by removing him from his position as Dean of the School of Business and reducing his salary after he complained of unlawful employment practices; and (5) a claim that Plaintiff is entitled to an award of attorneys' fees and expenses pursuant to 42 U.S.C. § 1988(b) and 29 U.S.C. § 216(b).  (Dkt. No. 3, ¶¶ 50-69 [Pl.'s Am. Compl.].) Familiarity with the factual allegations supporting these claims in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties.

## B.     Statement of Undisputed Material Facts

Before reciting the material facts of this case, the Court must address two issues it has identified in Plaintiff's response to Defendant's Statements of Material Facts, made pursuant to Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court.  First, with respect to many of

Defendant's factual assertions, Plaintiff admits "but denies the materiality of" those assertions. (*See, e.g.,* Dkt. No. 47, ¶¶ 39-41, 59-62 [Pl.'s Rule 7.1 Response].) Of course a party may not be awarded summary judgment on the basis of undisputed *immaterial* facts. As a result, a party opposing a motion for summary judgment may object that particular facts (disputed or undisputed) are immaterial to the motion. However, the materiality of an assertion of fact on a motion for summary judgment is a legal conclusion to be made by the Court. *See, e.g., Davis v. United States*, 11-CV-1211, 2015 WL 11142426, at *2, n.2 (N.D. Ga. March 31, 2015) ("[M]ateriality . . . [is] . . . a legal conclusion to be made by the Court . . . ."); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material."). As a result, where a non-movant has merely objected to the materiality of a properly supported fact, and the Court has concluded that the fact is material, the fact will be deemed admitted. *See, e.g., Newmark v. Lawrence Hosp. Ctr.*, 07-CV-2861, 2008 WL 5054731, at *8, n.7 (S.D.N.Y. Oct. 20, 2008) (finding two material facts admitted where the non-movant merely objected to the materiality of the facts); *accord, Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 938 (7th Cir. 1993); *Lee v. Univ. Underwriters Ins. Co.*, 12-CV-3540, 2014 WL 11858159, at *1 (N.D. Ga. June 25, 2014); *Cunningham v. Enter. Rent-a-Car Co.*, 07-CV-1615, 2010 WL 724507, at *2, n.3 (W.D. Pa. Mar. 1, 2010). Moreover, a non-movant denying a movant's factual assertion in a statement of facts is required to support that denial by "set[ting] forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3). Furthermore, "[t]he Court shall deem admitted any properly supported facts set forth in the [moving party's] Statement of Material Facts that the [non-moving] party does not specifically controvert." *Id.* Simply stated, regardless of whether some or all of the

facts to which Plaintiff responds as set forth above are immaterial for purposes of Defendant's motion for summary judgment, the issue of whether those *facts* are properly *disputed* is a separate matter.

Second, at various points throughout Plaintiff's Rule 7.1 Response, he "admits" facts asserted by Defendant in its Rule 7.1 Statement but then includes additional facts and/or legal argument in those responses. In these instances, the Court will treat Defendant's assertions as undisputed. (*See, e.g.,* Dkt. No. 47, ¶¶ 17, 21, 37 [Pl.'s Rule 7.1 Response].) *See also CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'"); *Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"). To the extent that Plaintiff wanted to set forth additional material facts that he contends are in dispute, he was required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs. *Johnson v. City of Troy*, 14-CV-0817, 2016 WL 5107124, at *8 n.12 (N.D.N.Y. Sept. 20, 2016) (Suddaby, C.J.).

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts ("Rule 7.1 Statement") and expressly admitted by Plaintiff in his response thereto ("Rule 7.1 Response"). (*Compare* Dkt. No. 41, Attach. 1 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 47 [Pl.'s Rule 7.1 Response].)

1. On May 18, 2010, Plaintiff was appointed Dean of the School of Business at Siena College and a tenured faculty member in the Department of Marketing and Management.

2. Plaintiff's appointment as Dean was an administrative appointment governed by the Siena College Administrators' Handbook, which he acknowledged receiving and reviewing. The advertisement for the deanship set forth the duties and responsibilities for the position.

3. Plaintiff's immediate supervisor as Dean was Dr. Linda Richardson, the Vice President for Academic Affairs who served as the College's Chief Academic Officer.

4. On January 7, 2013, Dr. Richardson met with Plaintiff and informed him of her concerns regarding his inadequate performance. She advised him in writing that, "if things do not improve, you will no longer serve as Dean of the School of Business at the conclusion of this semester. Furthermore, any egregious behavior on your part may call for immediate dismissal as Dean." Plaintiff acknowledged receipt of the memorandum of this meeting.

5. On February 1, 2013, Dr. Richardson met with Plaintiff to review his written response, dated January 10, 2013, to Dr. Richardson's concerns, as outlined in her letter dated January 7, 2013, regarding Plaintiff's performance and leadership as Dean.

6. Thereafter, Dr. Richardson sent a letter to Plaintiff, dated February 26, 2013, in which she referenced their meeting that was held on February 1, 2013, and raised new concerns regarding Plaintiff's performance.

7.     On May 22, 2013, following the College's commencement, Dr. Richardson met with Plaintiff.[1]

8.     By letter dated June 4, 2013, Dr. Richardson informed Plaintiff that the College had decided to terminate his appointment as Dean.

9.     According to Dr. Richardson, Plaintiff's removal from his position as Dean was based on a series of ongoing problems and concerns including the following: lacking effective leadership in the School of Business; becoming more detached; being less enthusiastic and interested in his responsibilities; being more aggressive and demeaning with some faculty members; lacking engagement; lack of responsibility; engaging in public disagreements with the Account Department; causing a breakdown in communications; breaching the confidentiality of faculty status meetings involving decisions on tenure and promotion, which compromised the College President's ability to make any changes or reconsider any of what had already been announced by Plaintiff; and being absent for Board of Trustees functions.[2]

10.    During the 2012-2013 academic year, Dr. Richardson expressed her increasing dissatisfaction with Plaintiff's performance of his administrative responsibilities to President Rev. Kevin Mullen.

---

[1]     There is a genuine dispute of material fact as to whether Dr. Richardson informed Plaintiff that his position as Dean was terminated or whether she informed him that his position was "uncertain" because she was unaware of whether a formal decision had been made.

[2]     (*Compare* Dkt. No. 41, Attach. 1, ¶ 11 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing that fact] *with* Dkt. No. 47, at ¶ 11 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

11.     During the academic year, an intervention was arranged by President Mullen and conducted by Dr. Joseph Pastore, a former chair of the Siena Board of Trustees and Provost of Pace University, to address relational issues and tensions within the School of Business, particularly interactions between the members of the Accounting Department.

12.     In May of 2013, following commencement, based on the recommendation of Dr. Richardson, President Mullen made the decision to remove Plaintiff from the position of Dean of the School of Business.

13.     President Mullen's decision to remove Plaintiff from his deanship was based on several factors relating to his recent performance with the key decisive factor in his decision being the breach of confidentiality of the promotion and tenure review process by Plaintiff (approximately three months before), thereby compromising the President's ability to make a final decision regarding promotion and tenure decisions advanced by the Faculty Status Committee.[3]

14.     Although President Mullen appreciated that Plaintiff acknowledged that he had made a mistake, President Mullen viewed Plaintiff's breach of confidentiality as egregious and a very serious mistake because he believed it tended to undermine the trust of everyone participating in the functioning of the Faculty Status Committee and its process.[4]

---

[3]     (*Compare* Dkt. No. 41, Attach. 1, ¶ 18 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing that fact] *with* Dkt. No. 47, at ¶ 18 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[4]     (*Compare* Dkt. No. 41, Attach. 1, ¶ 19 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing that fact] *with* Dkt. No. 47, at ¶ 19 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

15.     President Mullen determined that the cumulative effect of Plaintiff's impaired performance and diminished confidence coupled with the serious breach of confidentiality was the key decisive factor leading to his decision to remove him as Dean.[5]

16.     Plaintiff never discussed, presented, documented or commented or conveyed any concerns, complaints, reports to President Mullen involving gender inequity or gender bias regarding the salaries of female faculty members of Siena College.

17.     At no time did any administrator, faculty member, staff member, or trustee ever present or discuss, document, comment or convey to President Mullen any concerns, complaints, reports or references to gender inequity or gender bias with respect to the salaries of female faculty members of Siena College.

18.     President Mullen's decision to remove Plaintiff as Dean of the School of Business was not grounded in, or motivated by, non-managerial factors or reasons including alleged complaints or concerns of gender inequity or gender bias regarding the salaries of female faculty members of the College.[6]

19.     President Mullen determined to continue Plaintiff's salary as Dean at the same level following his removal during the summer months of 2013.

20.     Following removal from his position as Dean, Plaintiff retreated to a faculty position.

_____

[5]     (*Compare* Dkt. No. 41, Attach. 1, ¶ 20 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 47, at ¶ 20 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[6]     (*Compare* Dkt. No. 41, Attach. 1, ¶ 23 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 47, at ¶ 23 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

21.     President Mullen's decision regarding Plaintiff's salary reduction when he retreated to a faculty position was based on performance factors, the recommendation of Dr. Richardson, and the recognition that Plaintiff did not possess the accomplishments to warrant any further extensions of his salary as Dean.[7]

22.     Cynthia King-LeRoy, the Assistant Vice President for Human Resources at Siena College, never received any comment, expression of concern or complaint from Elaine Phelan involving gender bias regarding her compensation or title.

23.     Plaintiff never met with Christine Hammill-Cregan, the Equal Opportunity and Employee Relations Specialist and Title IX Coordinator at Siena College, regarding any complaints or concerns involving gender inequity, gender bias, or discrimination at Siena College.

24.     Sandra Mulay Casey, College counsel for Siena, does not recall Plaintiff ever raising, conveying, discussing or presenting any specific concerns, reports or complaints to her regarding gender inequity or gender bias involving the salaries or compensation of Siena faculty.

25.     At no time during Professor Paul Dwyer's service as Chair of the General Faculty Committee did Plaintiff ever raise, convey, present or discuss any concerns or complaints to Professor Paul Dwyer or the General Faculty Committee regarding gender inequity or gender bias involving the salaries of Siena College faculty members.

26.     At no time during Professor Dwyer's tenure as a faculty member did Plaintiff ever raise, convey, present or discuss any concerns or complaints regarding gender inequity or gender bias involving the salaries of Siena College faculty members.

---

[7]      (*Compare* Dkt. No. 41, Attach. 61, ¶ 26 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 47, at ¶ 26 [Pl.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

27.     At no time during Professor Dwyer's service as Chair of the General Faculty Committee did any faculty member, administrator, or officer ever raise, convey, present or discuss any concerns or complaints to Professor Dwyer or to the General Faculty Committee regarding gender inequity or gender bias involving the salaries of Siena College faculty members.

28.     Professor Dwyer personally observed significant tensions and discord between members of the Accounting and Business Law Department and Plaintiff during Plaintiff's tenure as Dean of the School of Business.

29.     Professor Elaine Phelan personally observed an ongoing absence of harmony between the members of the Accounting Department and Plaintiff in his role as Dean of the School of Business.

30.     Professor Wanda Causseaux, an Assistant Professor in the Accounting Department at the School of Business, is not aware of any employees of Siena College who alleged gender discrimination or gender disparity or discrimination in general in their compensation at Siena College.

31.     Professor Causseaux is not aware of any current or former employees of Siena College who have alleged any type of workplace retaliation.

32.     Dr. John C. O'Neill, who served as Plaintiff's Assistant Dean of the School of Business, is not aware of any employees at Siena College who alleged gender discrimination or gender disparity or any female faculty members who were concerned that they were being paid less than their male faculty colleagues.

33.     Dr. O'Neill is not aware of any allegations of retaliation at Siena College.

34.     It is the opinion of Dr. Michael T. Marsden, Ph.D., that Plaintiff was appropriately and necessarily removed from his position as Dean and returned to his tenured faculty position.  Similarly, it is Dr. Marsden's opinion that Plaintiff's removal was based on sound academic and administrative reasoning given the seriousness of his performance issues, which had been a major concern of Dr. Richardson and President Mullen at least a year before Plaintiff was removed.

35.     On March 29, 2014, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

36.     On or about April 4, 2014, Plaintiff filed an Amended Charge of Discrimination with the EEOC.

37.     On April 9, 2014, Plaintiff commenced an action in New York Supreme Court, County of Albany.

38.     On June 4, 2014, Siena College filed its Answer with affirmative defenses to the Amended Charge of Discrimination.

39.     On January 2, 2015, Siena College filed a petition to remove the state court action to the U.S. District Court for the Northern District of New York.

40.     Plaintiff requested personal leave status from Siena College on May 12, 2016, which was subsequently granted on May 24, 2016.

41.     Plaintiff was appointed Dean of the School of Management at Rhode Island College on August 1, 2016.

### C.     The Parties' Briefing of Defendant's Motion

#### 1.     Defendant's Memorandum of Law in Chief

Generally, in its memorandum of law, Defendant asserts eight arguments.  (Dkt. No. 41, Attach. 61 [Def.'s Mem. of Law].)

First, Defendant argues that Plaintiff's removal from his deanship was consistent with the College's *Administrators' Handbook*, which governed Plaintiff's appointment, because (a) Plaintiff's appointment was an at-will appointment, (b) his removal required only notice and not cause, (c) the notice provided to Plaintiff (i.e., Dr. Richardson verbally informing Plaintiff of his removal, and then sending a written confirmation on June 4, 2013), was consistent with what was required by the Handbook, and (d) Plaintiff's removal was appropriate in light of his serious performance issues that persisted for at least a year before he was finally removed.  (*Id.* at 14-15.)[8]

Second, Defendant argues that the factual predicates for Plaintiff's retaliation claims under Title VII, the FLSA, and the NYSHRL are identical and, therefore, are duplicative.  (*Id.* at 16.)

Third, Defendant argues that Plaintiff did not engage in protected activity under the FLSA when he allegedly made an intra-company complaint to college administrators regarding wage disparity because Siena College was not provided with fair notice of any such grievance.  (*Id.* at 17-18.)  More specifically, Defendant argues that there is no written evidence in the record demonstrating that Plaintiff lodged a formal complaint or concern regarding wage

---

[8]     Page citations refer to the page numbers used on CM/ECF rather than the actual page numbers contained in the parties' respective motion papers.

disparity and that his allegations are more akin to "a grumble in the hallway" regarding payroll practices. (*Id.* at 18-19.) Furthermore, Defendant argues that, when Plaintiff's conduct and deposition testimony are juxtaposed, it demonstrates the absence of any purported protected activity for the following four reasons: (1) Plaintiff acted unilaterally in his role as Dean when he offered the position of Director of the Master of Science with an accompanying salary to Professor Phelan; (2) the College ultimately agreed to Professor Phelan's appointment and the salary that was offered to her; (3) Professor Phelan never raised any gender bias or gender inequity concerns or complaints to Plaintiff or anyone else at the College regarding her selection, title or compensation; and (4) Plaintiff's deposition testimony denies any such concern or complaint. (*Id.* at 19.)

Fourth, Defendant argues that Plaintiff cannot meet his initial burden to establish a *prima facie* retaliation claim for the following four reasons: (1) Plaintiff was not engaged in protected activity when he allegedly made an intra-company complaint or concern regarding gender wage disparity; (2) the College was not aware of any complaint or concern, which lack of awareness is conspicuous in light of (i) the many opportunities Plaintiff had to lodge a complaint, and (ii) Plaintiff's background as a human resources professional, published author, and highly experienced college administrator who was well-versed in employment law; (3) Plaintiff's removal from his deanship was consistent with the guidelines in the *Administrators' Handbook* and justified based upon his ongoing performance and managerial deficiencies; and (4) the absence of a causal connection between the decision to remove Plaintiff and any alleged protected activity. (*Id.* at 20-23.)

Fifth, Defendant argues that, even if Plaintiff can establish a *prima facie* case of retaliation, Siena College had legitimate, non-retaliatory, reasons for removing him as Dean, including, among other things, (a) Plaintiff's breach of confidentiality, (b) growing dissatisfaction with his performance, (c) Plaintiff's poor treatment and demeaning communications to faculty members, (d) discontent in the Accounting Department, (e) Plaintiff's unprofessional demeanor when meeting with guidance counselors, and (f) Plaintiff's failure to chair department board meetings. (*Id.* at 23-24.)

Sixth, Defendant argues that the record evidence does not support any inference that its reasons for removing Plaintiff were a pretext for retaliation and that, but-for Plaintiff's alleged protected activity, he would not have been removed from his position. (*Id.* at 24-25.)

Seventh, Defendant argues that, under the so-called "manager rule," Plaintiff did not engage in oppositional conduct that rises to the level of protected activity. (*Id.* at 25-26.) More specifically, Defendant argues that it was Plaintiff's responsibility, as Dean of the School of Business, to report issues affecting faculty that he oversaw and that the mere performance of that function cannot be deemed "opposition" to his employer. (*Id.* at 27.) In addition, Defendant argues that, because there is no record evidence that Plaintiff complained of or raised concerns about wage disparity, he cannot establish that he engaged in conduct that would be considered outside of his general work responsibilities and would entitle him to protection under anti-retaliation statutes. (*Id.*)

Eighth, and finally, Defendant argues that Plaintiff's Title VII retaliation claims are time-barred. (*Id.* at 28.) Specifically, Defendant argues that, in order to be timely, a plaintiff pursuing a Title VII claim must first file an administrative complaint with the EEOC within 300 days from

when the alleged unlawful employment action occurred. (*Id.*) Defendant argues that Plaintiff

filed his Charge of Discrimination with the EEOC on March 29, 2014, meaning that any alleged

unlawful employment actions occurring before March 23, 2013, are time-barred. (*Id.* at 29.)

Defendant notes that Plaintiff's Charge of Discrimination alleges that, "[d]uring the *later of half

of 2012*, [Plaintiff] raised concerns on more than one occasion regarding gender inequity in

salaries of College faculty[.]" (*Id.*) (Emphasis added). Therefore, to the extent that Plaintiff's

claims are based upon alleged unlawful employment actions that occurred in 2012, those claims

are time-barred. (*Id.*)

### 2.     Plaintiff's Opposition Memorandum of Law

Generally, Plaintiff makes the following eight arguments in opposition to Defendant's

motion for summary judgment. (Dkt. No. 48 [Pl.'s Opp'n Mem. of Law].)

First, Plaintiff argues that he engaged in protected activity when he repeatedly

complained about gender wage disparity to multiple high-level administrators during the summer

and fall of 2012. (*Id.* at 18-19.) Contrary to Defendant's assertions, Plaintiff argues that his

involvement in Professor Phelan's situation is heavily documented and that Defendant was on

notice of his complaints. (*Id.* at 19-20.) Furthermore, Plaintiff argues that his deposition

testimony in no way "confirms the absence" of the complaints alleged in his pleadings; rather,

Defendant elected not to ask him specific questions regarding those allegations at his deposition.

(*Id.*)

Second, Plaintiff argues that the manager rule does not apply in this case for the

following two reasons: (1) as Dean, he was not responsible for receiving, investigating or

reporting claims of discrimination, which was, instead, the College's Title IX Officer's

responsibility; and (2) when he noticed a discriminatory trend in the College's salary records, he "stepped outside of his role" as Dean and advocated for female professors who may not have been aware of the disparity. (*Id.* at 21-22.)

Third, Plaintiff argues that the temporal proximity between the times he raised concerns about gender wage disparity and the adverse actions taken against him demonstrate but-for causation. (*Id.* at 22-23.) More specifically, Plaintiff argues that he received consistently positive performance evaluations, as well as written and oral accolades, for his performance as Dean until January 2013. (*Id.* at 23.) However, soon after he complained about gender wage disparity, Dr. Richardson began criticizing his performance and leadership. (*Id.*) Despite refuting these accusations through written responses, Dr. Richardson recommended to President Mullen that Plaintiff be removed from his position and that his salary be reduced by 30%, which President Mullen ultimately agreed to. (*Id.*)

Fourth, Plaintiff argues that Defendant's proffered non-retaliatory reasons for his removal were pretext for retaliation because (a) for more than two years in his position as Dean, Plaintiff was held in high regard by his superiors and received praise both orally and in writing, (b) it was not until after his complaints of discrimination did he suddenly begin to receive criticism and negative treatment from Dr. Richardson, (c) his written and detailed responses to Dr. Richardson's criticisms were largely disregarded, (d) there is no factual support in the record for the vague and conclusory negative statements made about Plaintiff, and (e) no other dean's salary was reduced in similar fashion after they retreated to a faculty position. (*Id.* at 24.)

Fifth, Plaintiff argues that his Title VII claim is not time-barred for the following three reasons: (1) he first learned that he was being removed from his position by letter, dated June 4,

2013, which is within the limitations period, and not during his meeting with Dr. Richardson on May 22, 2013; (2) he first learned that his salary was being reduced on July 14, 2013, which is, once again, within the limitations period; and (3) the only operative date for statute of limitations purposes is the date of the adverse employment action and, therefore, Plaintiff may rely on any protected activity he engaged in that occurred outside of the limitations period. (*Id.* at 25-26.)

Sixth, Plaintiff argues that his breach-of-contract claim, which alleges that his salary was wrongfully reduced, should proceed to trial because Defendant has not made specific arguments in support of its dismissal and, therefore, this claim remains unopposed. (*Id.* at 26.)

Seventh, Plaintiff argues that the opinions of Defendant's expert, Michael T. Marsden, Ph.D., should be excluded because they are inadmissable under Fed. R. Evid. 702 for the following four reasons: (1) Dr. Marsden is not qualified to offer his proffered opinions because he does not have experience or specialized training in human resources; (2) his opinions are unreliable because they (i) are based on interviews with a limited number of Siena College representatives where Dr. Marsden failed to ask questions about evidence that contradicts their statements, and (ii) Dr. Marsden subjectively gave more credibility to the statements made by College representatives while summarily rejecting the credibility of Plaintiff's contentions as "mere excuses"; (3) Dr. Marsden's impermissible evaluation of witness credibility usurps the role of the jury and, in any event, his testimony will not assist the trier of fact because evaluation of retaliation claims does not require an expert to aid a lay person in reaching a determination; and (4) the prejudice of Dr. Marsden's opinions substantially outweighs its probative value because it impermissibly bolsters the credibility of the College representatives. (*Id.* at 26-30.)

Eighth, and finally, Plaintiff argues that affidavits filed by Defendant from various witnesses should be precluded because (a) there is no proof in the record that these witnesses played any role in the decisions to terminate his appointment as Dean and/or reduce his salaray or that Dr. Richardson or President Mullen relied on information from them in making their decisions, and (b) Defendant failed to identify these witnesses during discovery and preclusion is therefore warranted pursuant to Fed. R. Civ. P. 26(a) and 37(c)(1). (*Id.* at 30-31.)

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply memorandum of law, Defendant asserts five arguments. (Dkt. No. 50 [Def.'s Reply Mem. of Law].)

First, Defendant argues that Plaintiff has failed to meet his *prima facie* burden regarding his retaliation claims for the following six reasons: (1) Plaintiff relies exclusively on his affidavit in opposing the present motion, the contents of which contradict his deposition testimony and have been refuted by several witnesses; (2) Plaintiff failed to give adequate notice of his complaints to Siena College; (3) the College's salary records from 2010 to 2014 establish that there was no gender inequality in pay, let alone a "trend," that Plaintiff could have noticed, reported, or opposed; (4) in any event, the manager rule precludes his retaliation claims because (i) as Dean, Plaintiff was responsible for overseeing Professor Phelan's promotion, including investigating and reporting claims of discrimination to the Title IX officer, and (ii) the statements he attributes to Professor Phelan in his affidavit and in support of his claims have been entirely refuted by her; (5) temporal proximity does not support causation because Plaintiff received several warnings from January to May 2013 regarding his performance, including a final warning that his job was in jeopardy; and (6) the College's reasons for removing Plaintiff

were not pretextual because (i) despite Plaintiff's argument that he received consistently high marks for his job performance for more than two years into his employment, the undisputed facts demonstrate several instances of deficient job performance during his third year as Dean; (ii) Plaintiff's argument that he began receiving criticism only after making complaints of discrimination is not supported by the record evidence, nor does it render the College's reasons for removing him false; and (iii) Plaintiff's argument that the record does not provide factual support for the College's criticisms of his performance ignores the fact that he never challenged his removal under the remedies provided in the *Administrators' Handbook*, he admitted to a serious breach of confidentiality regarding the College's promotions and tenure procedures, and he had egregious performance deficiencies which were specific and well documented. (*Id.* at 4-8.)

Second, Defendant reiterates its argument that the statute of limitations began to run when Plaintiff was given notice of his removal during a meeting with Dr. Richardson on May 22, 2013. (*Id.* at 9.) Furthermore, Defendant argues that the notice that was given to Plaintiff by Dr. Richardson during their meeting, the follow-up letter that was sent to Plaintiff to confirm his removal, and the reduction of his salary are not separate discrete acts but are instead part and parcel of the determination to remove him. (*Id.*) Defendant also argues that there is nothing in the record to support application of the continuing-violation doctrine and, even if some of Plaintiff's claims are found to be timely, anything preceding the accrual date should be considered only as "background evidence in support of a timely claim." (*Id.* at 10.)

Third, Defendant argues that Plaintiff's breach-of-contract claim should be dismissed because Plaintiff was hired as an at-will employee pursuant to an appointment letter, which is governed by the *Administrators' Handbook*, and an employment contract was never executed. (*Id.* at 10-11.)

Fourth, Defendant argues that its expert witness, Dr. Marsden, should not be precluded because (a) the case law relied upon by Plaintiff utilizes the appellate standard of review for expert preclusion and not the one appropriate for this stage of litigation, (b) Plaintiff's argument regarding the admissibility of Dr. Marsden's opinions are merely opinionated and unsupported, and (c) Plaintiff's argument that there is no need for an expert in retaliation cases is unsupported under Fed. R. Evid. 702 and by the cases he cites.  (*Id.* at 11-12.)

Fifth, and finally, Defendant argues that the witness affidavits it submitted in support of its motion should not be precluded because (a) the witnesses were properly disclosed in its notice of motion and Plaintiff had nearly a month to file a formal motion to preclude their testimony or to interview them, (b) Plaintiff relies on these affidavits in both his own affidavit and opposition memorandum of law, and (c) Plaintiff will not be prejudiced if these affidavits are considered because he was well aware of who these witnesses are and the scope of their knowledge as it pertains to this lawsuit.  (*Id.* at 12-13.)

## II.    STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[9]  As for the materiality requirement, a dispute of

---

[9]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[10] Of course, when a non-movant fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

---

[10]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has failed to properly respond to that statement,[11]

Similarly, in this District, where a non-movant has failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[12] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[11]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[12]    *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III.    ANALYSIS

### A.    Whether Plaintiff's Title VII Claim Is Time-Barred

After carefully considering the matter, the Court answers this question in the negative for the reasons stated by Plaintiff in his opposition memorandum of law.  (Dkt. No. 48, at 25-26 [Pl.'s Opp'n Mem. of Law].)  To those reasons, the Court adds the following analysis.

It is well settled that "Title VII's statute of limitations bars claims based on events occurring more than 300 days prior to filing a charge of discrimination with a state or local employment agency." *Garcia v. Yonkers Bd. of Educ.*, 188 F. Supp. 3d 353, 358 (S.D.N.Y. 2016).  "With respect to plaintiff's retaliation claims under Title VII, it is clear that for statute of limitations purposes, the clock begins to run at the time the adverse employment action occurred–not when the plaintiff engaged in the underlying protected activity." *James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 310 (E.D.N.Y. 2012).

As discussed above in Part I.C.1. of this Decision and Order, Defendant argues that Plaintiff was given notice that he was being terminated from his position during a meeting with Dr. Richardson on May 22, 2013, which is 301 days before Plaintiff filed a charge of discrimination with the EEOC on March 19, 2014.  However, Plaintiff testified at his deposition, and states in his affidavit, that he first learned of his termination by letter dated June 4, 2013. (Dkt. No. 45, ¶ 53 [Mello Aff.]; Dkt. No. 41, Attach. 27, at 129:21-130:12, 142:9-14 [Mello Dep.].)  Defendant does not cite any record evidence, such as Plaintiff's deposition testimony, that contradicts this assertion.  *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous

deposition testimony."). Therefore, the competing assertions made in Plaintiff's and Dr.

Richardson's respective affidavits create, at a minimum, a genuine dispute of material fact with

respect to this issue. Because the Court must resolve all ambiguities in favor of Plaintiff, the

Court will utilize the date of the termination letter, which is within the limitations period (288

days), as the accrual date for purposes of Plaintiff's Title VII claim. Finally, the Court will

consider allegations of protected activity and retaliation that occurred outside of the statute of

limitations period as "background evidence" in support of Plaintiff's claim. *See Chan v.

Donahoe*, 63 F. Supp. 3d 271, 299 (E.D.N.Y. 2014) ("The Court of Appeals for the Second

Circuit has consistently held that allegations of retaliation that extend beyond the limitations

period should be considered as background evidence in order to appropriately assess the validity

of a retaliation claim."); *accord, Fanelli v. New York*, 51 F. Supp. 3d 219, 228 (E.D.N.Y. 2014).

**B.      Whether the Proffered Testimony of Dr. Marsden Must Be Excluded**

The Court has some reservations regarding Dr. Marsden's proposed opinions. For

example, whether an expert opinion is required in order to better understand the determinative

issues in this case is questionable. Several courts in similar contexts have found that an expert

opinion is not required. *See Wilson v. Muckala*, 303 F.3d 1207, 1218 (10th Cir. 2002) (affirming

district court's exclusion of plaintiff's human resources expert in sexual harassment case,

agreeing with lower court that "the facts were 'not so complicated as to require the testimony of

an expert witness on either the adequacy of the [sexual harassment] plan or policy or the

investigation' that followed"); *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1271 (9th Cir.

1980) (affirming exclusion of expert testimony because the "question whether gender was the

basis of differential treatment is not so technical as to require the aid of an expert to enlighten the

jury or court"); *Grimes v. Wal-Mart Stores Texas, LLC*, 10-CV-0067, 2012 WL 12883080, at *4

(W.D. Tex. Jan. 23, 2012) (precluding expert witness's opinion, in part, because her "testimony

would not aid the trier of fact because Defendant's employment/career policies, and the manner

in which they are alleged to have deviated from them, are not so complex as to require expert

explanation"); *Smith v. Colorado Interstate Gas Co.*, 794 F. Supp. 1035, 1044 (D. Colo. 1992)

(granting defendant's motion to exclude expert testimony regarding gender and race

discrimination because "[g]ender and race discrimination are issues an average person can

evaluate and understand without the assistance of an expert," and stating that experts may not

"impermissibly seek to direct the result . . . [of the] case").

Moreover, while there is no question that, based on Dr. Marsden's curriculum vitae, he

has had an extensive and distinguished career in academia (Dkt. No. 41, Attach. 29, at 6-7 [Dr.

Marsden's CV]), many of the positions he has held are either as a professor or as an

administrator (e.g., dean or provost) and not in a human-resources-related department.

Therefore, Plaintiff's argument that Dr. Marsden does not have relevant experience with gender

discrimination or retaliation claims appears to have some merit. *See Grimes*, 2012 WL

12883080, at *4 (precluding opinion evidence proffered by a practicing employment lawyer who

was offered as an expert in human resources in a Title VII retaliation case, in part, because "she

never worked in human resources"); *Parton v. United Parcel Serv.*, 02-CV-2008, 2005 WL

5974445, at *3-4 (N.D. Ga. Aug. 2, 2005) (precluding expert who sought to testify about

"standard human resources practices" regarding employee discipline because expert's education

and professional experience did not specifically relate to this subject matter).

Finally, the Court also finds it troubling that Dr. Marsden appears to have made credibility determinations in formulating his conclusions. Specifically, in outlining the facts of the case, Dr. Marsden's expert report states that, in responding to one of Dr. Richardson's letters expressing her concerns regarding Plaintiff's performance, Plaintiff's "letter offered excuses for the issues raised by Dr. Richardson[.]" (Dkt. No. 41, Attach. 30, at 3 [Dr. Marsden's Expert Rep.].) Dr. Marsden describes Plaintiff's second response letter the same way, stating that the letter offered more "excuses" for the issues raised by Dr. Richardson. In contrast, when questioned about statements made by Dr. Richardson and Cynthia King-Leroy, Dr. Marsden testified at his deposition that he assessed their credibility and found both of them to be credible. (Dkt. No. 41, Attach. 31, at 117:2-118:1 [Marsden Dep.].) It is beyond dispute that credibility determinations are exclusively reserved for the jury. Therefore, whether the reasons articulated in Plaintiff's response letter are "excuses" is for a jury to decide. Similarly, it is for a jury to determine whether Dr. Richardson's and Cynthia King-Leroy's version of events are more believable than Plaintiff's. *See DiBella v. Hopkins,* 403 F.3d 102, 121 (2d Cir. 2005) ("[E]xpert witnesses may not testify based on their personal view of the veracity of a lay witness's testimony."); *Pittman v. Gen. Nutrition Corp.*, 2007 WL 951638, at *5 (S.D. Tex. Mar. 28, 2007) (striking portions of an expert report that stated that plaintiff "is a credible witness and that [his version of] facts and events actually occurred" because "[e]xpert witnesses may not pass judgment on the credibility of other witnesses"). Having said all of that, the Court finds that it need not resolve this issue because, even if it were to exclude Dr. Marsden's testimony, the Court would still dismiss Plaintiff's Amended Complaint for the reasons discussed below in Part III.D. of this Decision and Order.

-25-

## C. Whether the Affidavits of Sandra Casey, Paul Dwyer, Christine Hammill-Cregan, and Neichole Keefer Must Be Struck[13]

After carefully considering the matter, the Court answers this question in the negative, in part for the reasons stated in Defendant's reply memorandum of law. (Dkt. No. 50, at 13 [Def.'s Reply Mem. of Law].)[14] To those reasons, the Court adds the following analysis.

As an initial matter, the Court notes that, in this Court's Uniform Pretrial Scheduling Order, the discovery deadline for mandatory disclosures was February 20, 2015. (Dkt. No. 8, at 1 [Uniform Pretrial Scheduling Order].) Defendant's notice of motion is dated August 11, 2016, and Defendant does not dispute Plaintiff's argument that this was the first time that these affiants were disclosed as witnesses. Although the Court does not condone a party's failure to comply with discovery deadlines or its obligations under Fed. R. Civ. P. 26(a), the Court finds that the failure to disclose the identities of Ms. Casey and Ms. Hammill-Cregan as potential witnesses is harmless, and will not cause prejudice to Plaintiff, because it is clear that he was aware of their identities and the scope of their knowledge as it pertains to his claims well in advance. (*See*,

---

[13]     Ms. Casey served as college counsel for Siena College from October 2003 to April 2013. (Dkt. No. 41, Attach. 58, ¶ 2 [Casey Aff.].) Mr. Dwyer is a full-time faculty member at Siena College and is a member of the Accounting and Business Law Department. (Dkt. No. 41, Attach. 56, ¶ 1 [Dwyer Aff.].) In addition, he served as the Chair of the Siena College General Faculty Committee from September 1, 2012, to September 1, 2015. (*Id.*, ¶ 2.) Ms. Hammill-Cregan served as the Equal Opportunity and Employee Relations Specialist-Title IX Coordinator at Siena College from October 2010 to October 2013. (Dkt. No. 41, Attach. 54, ¶ 1 [Hammill-Cregan Aff.].) Ms. Keefer is a paralegal employed by Defendant's law firm. (Dkt. No. 41, Attach. 59, ¶ 1 [Keefer Aff.].)

[14]     The Court notes that Ms. Keefer's affidavit was submitted in support of the assertion that Plaintiff had been hired as Dean of the School of Management by Rhode Island College. (Dkt. No. 41, Attach. 59 [Keefer Aff.].) This fact was admitted by Plaintiff in his response to Defendant's Rule 7.1 statement. (Dkt. No. 47, ¶ 64 [Pl.'s Rule 7.1 Response].) Accordingly, whether Ms. Keefer's affidavit is considered by the Court appears to be irrelevant.

*e.g.*, Dkt. No. 45, ¶¶ 26, 29-30, 52, 55-56 [Mello Aff.] [discussing the involvement of Ms. Hammill-Cregan and Ms. Casey in the events giving rise to Plaintiff's claims]; Dkt. No. 41, Attach. 27, at 81:19-23, 100:18-101:4, 138:20-139:10 [Mello Dep.].) *See also Lore v. City of Syracuse*, 00-CV-1833, 2005 WL 3095506, at *2 (N.D.N.Y. Nov. 17, 2005) (Munson, J.) (holding that, "[w]hile it may be true that plaintiff failed to adhere to the letter of the discovery rules, the court is convinced that defendants were sufficiently aware of the existence and relevance of the persons in question so that defendants are not being subject to trial by ambush"); *Morgenstern v. Cty. of Nassau*, 04-CV-0058, 2008 WL 4449335, at *2 (E.D.N.Y. Sept. 29, 2008) (finding harmless error where plaintiff was aware of affiant's role in lawsuit, testified about affiant's role in deposition, and served document request on defendant seeking documents from affiant); *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, 01-CV-1047, 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) ("[A] failure to disclose witness information is harmless if the other party was well aware of the identity of the undisclosed witness and the scope of their knowledge well before trial.") (internal quotation marks omitted).  Similarly, because Mr. Dwyer was a faculty member in a department supervised by Plaintiff, as well as the Chair of the College's General Faculty Committee, Plaintiff was undoubtedly aware of Mr. Dwyer's identity and the potential scope of his knowledge.  (Dkt. No. 45, Attach. 17, at 3 [attaching e-mail from Dr. Richardson to Plaintiff discussing that Paul Dwyer had requested a review of Plaintiff's joint faculty appointment].)

In any event, the Court notes that, even if it did not consider these affidavits in adjudicating Defendant's summary judgment motion, the Court would still dismiss Plaintiff's Amended Complaint for the reasons that follow.

### D. Whether Plaintiff's Claims Under the NYSHRL, Title VII, and Equal Pay Act Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative because Plaintiff has failed to create a genuine dispute of material fact regarding whether Defendant's adverse actions were causally related to his protected activity, in part for the reasons stated by Defendant in its memoranda of law. (Dkt. No. 41, Attach. 61, at 23-25 [Def.'s Mem. of Law]; Dkt. No. 50, at 7-8 [Def.'s Reply Mem. of Law].) To those reasons, the Court adds the following analysis, which, for purposes of a complete record, considers each element required to prove Plaintiff's claims under the *McDonnell Douglas* burden-shifting framework.

"The burden-shifting framework laid out in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)] governs retaliation claims under both Title VII and the NYSHRL." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). This includes FLSA retaliation claims as well. *See Husser v. New York City Dep't of Educ.*, 137 F. Supp. 3d 253, 258 n.1 (E.D.N.Y. 2015) ("FLSA retaliation claims are analyzed using the same *McDonnell Douglas* three-step burden shifting scheme that applies to Title VII and NYSHRL retaliation claims."). "To make out a prima facie case of retaliation, a plaintiff must make four showings: that (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa*, 708 F.3d at 125 (internal quotation marks omitted). "If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.* (internal quotation marks and alterations omitted). There is no dispute that removing Plaintiff from his

position as Dean and reducing his salary constitute adverse employment actions.  However, the parties dispute the remaining elements.

### 1.    Whether Plaintiff Engaged in Protected Activity

"To establish that she engaged in protected activity, [a plaintiff] need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Id.* at 126 (internal quotation marks omitted).  "An unlawful employment practice is discrimination on the basis of any of seven prohibited criteria: race, color, religion, sex, national origin, opposition to employment discrimination, and submitting or supporting a complaint about employment discrimination." *Cooper v. New York State Dep't of Labor*, 819 F.3d 678, 681 (2d Cir. 2016) (internal quotation marks omitted).

Here, Plaintiff's affidavit demonstrates that he had a good-faith reasonable belief that Siena College was engaged in unlawful discrimination against female faculty members by paying them lower salaries than their male colleagues.  (Dkt. No. 45, ¶¶ 20-30 [Mello Aff.].) (Dkt. No. 45, Attachs. 13-16.)  In addition, Plaintiff has submitted e-mail correspondence between himself and College administrators expressing his concerns regarding Professor Phelan's situation while specifically noting that she had raised concerns regarding "gender bias." (Dkt. No. 45, Attach. 15.)  Furthermore, in an appeal from President Mullen's initial determination of Professor Phelan's salary, Plaintiff notes that "[Professor Phelan] is better qualified than the incumbent and of a different gender which could invite allegations of Equal Pay Act and Title VII violations." (Dkt. No. 45, Attach. 16; Dkt. No. 45, ¶ 39 [Mello Aff.].) This evidence demonstrates Plaintiff's belief that Professor Phelan was not being given the same treatment as her male predecessor, as well as his advocacy on her behalf.

In this Court's previous Decision and Order, the Court invited the parties to discuss the applicability of the manager rule in any future motions. (Dkt. No. 33, at 10.) According to the Second Circuit, "[t]his rule provide[s] that complaints of discrimination within the scope of a manager's job duties are not protected activities, and that, in order to engage in protected activity, the employee must 'step outside his or her role of representing the company' and take action adverse to the company." *Littlejohn v. City of New York*, 795 F.3d 297, 316 n.16 (2d Cir. 2015). The Second Circuit declined to say whether it would adopt this rule but noted that "[t]he manager rule's focus on an employee's job duties, rather than the oppositional nature of the employee's complaints or criticisms, is inapposite in the context of Title VII retaliation claims." *Littlejohn*, 795 F.3d at 316 n.16. Since *Littlejohn*, at least one court in this Circuit has interpreted this language to mean that the Second Circuit had declined to adopt the manager rule. *See Taft v. Agric. Bank of China Ltd.*, 156 F. Supp. 3d 407, 415-16 (S.D.N.Y. 2016) (stating that "the Second Circuit has recently declined to adopt the 'manager rule'" and citing *Littlejohn*). The Court does so as well.

As a result, the Court will focus on the "oppositional nature" of Plaintiff's complaints in determining whether his activity was truly oppositional (and therefore protected) in light of his position as Dean. "[A] supervisor's 'mere passing on' of a complainant's statements is not inherently 'oppositional' in the same way as the victim's own report of that misconduct. . . . Conversely, a supervisor who acts as an advocate for the alleged victim may be said to have engaged in opposition under Title VII." *Martin v. State Univ. of New York*, 704 F. Supp. 2d 202, 228-29 (E.D.N.Y. 2010) (internal quotation marks and citations omitted). Here, based on the current record, the Court finds that sufficient evidence exists that Plaintiff was acting as an advocate for Professor Phelan. Accordingly, the Court finds that Plaintiff has made out a prima facie case that he engaged in protected activity.

## 2. Whether Siena College Was Aware of Plaintiff's Protected Activity

"[I]mplicit in the requirement that the employer [was] aware of the protected activity is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's opposition was directed at [prohibited] conduct." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). "[P]articular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (explaining that protected activity to support retaliation claim must involve complaints that are not generalized, but rather complaints that the employer could reasonably understand involves conduct prohibited by Title VII); *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (stating that "informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII"). "[F]or purposes of a prima facie case, a plaintiff my rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013).

Here, Defendant argues that there is no record evidence that Plaintiff ever submitted a written complaint expressing his concerns regarding gender inequity or gender bias in salaries paid to faculty members. However, as discussed above, Plaintiff has submitted e-mail correspondence between himself, Dr. Richardson, Cynthia King-Leroy, and other Siena employees raising concerns about the disparity in pay between Professor Phelan and her predecessor. (Dkt. No. 45, Attachs. 13-16.) Furthermore, the appeal that was submitted from President Mullen's determination regarding Professor Phelan's salary was signed by Dr.

Richardson and Ms. Hammill-Cregan. (Dkt. No. 45, Attach. 16; Dkt. No. 45, ¶ 39 [Mello Aff.].)

Although Plaintiff asserts in his affidavit that he noticed other wage disparities, there is no

record evidence (other than his affidavit) that supports his claim that he brought that issue to the

attention of anyone at Siena. (Dkt. No. 45, ¶¶ 20-30 [Mello Aff.].) Defendant has filed several

affidavits from witnesses such as Ms. Hammill-Cregan (Dkt. No. 41, Attach. 54, ¶¶ 9-10) Ms.

Casey (Dkt. No. 41, Attach. 58, ¶ 5), Ms. King-Leroy (Dkt. No. 41, Attach. 49, ¶ 7), Dr.

Richardson (Dkt. No. 41, Attach. 41, ¶¶ 27-28), and even Ms. Phelan (Dkt. No. 41, Attach. 55,

¶¶ 9-10), who state that Plaintiff never raised any concerns regarding wage disparity based on

gender. Granted, "[i]t is . . . hornbook law that a self-serving affidavit that merely reiterates

conclusory allegations in affidavit form is insufficient to prelude summary judgment." *Wojcik v.*

*Brandiss*, 973 F. Supp. 2d 195, 213 (E.D.N.Y. 2013) (internal quotation marks omitted).

However, the Court finds that Plaintiff's affidavit, coupled with the e-mail correspondence

related to Professor Phelan, creates a genuine dispute of material fact regarding whether

Defendant was aware of Plaintiff's protected activity.

### 3. Whether Defendant's Adverse Action Was Causally Linked to Plaintiff's Protected Activity

As discussed above in Part I.C.2. of this Decision and Order, Plaintiff argues that he

received positive performance evaluations for the first two-and-a-half years that he served as

Dean; however, soon after he complained about gender wage disparity, Dr. Richardson began

criticizing his performance and leadership. Based upon the record evidence, it is apparent that

Plaintiff first raised concerns regarding Professor Phelan's salary in an e-mail dated October 22,

2012. (Dkt. No. 45, Attach. 14.) This eventually led to an appeal being filed on December 3,

2012, in an effort to increase Professor Phelan's salary. (Dkt. No. 45, Attach. 16.) On

December 20, 2012, Plaintiff was notified that the School of Business at Siena College had successfully maintained its accreditation. President Mullen stated that he was "very pleased" and several other members of the College congratulated Plaintiff on this achievement. (Dkt. No. 45, Attach. 20.) Thereafter, on January 7, 2013, Plaintiff received a letter from Dr. Richardson expressing her concerns regarding his performance.

"The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima face case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001). However, "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Flood v. UBS Global Asset Mgmt.*, 10-CV-0374, 2012 WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012); *see also Chin-McKenzie v. Continuum Health Partners*, 876 F. Supp. 2d 270, 287 (S.D.N.Y. 2012) (collecting cases). Importantly, "negative performance evaluations or written warnings, without an accompanying change in the terms and conditions of employment, will not rise to the level of an adverse employment action." *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 586 (W.D.N.Y. 2015); *see also Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 217 (E.D.N.Y. 2014) (citing cases).

Here, Plaintiff has neither alleged nor demonstrated that he suffered any change in the terms and conditions of employment from January 7, 2013 (when he received Dr. Richardon's first letter) to May 22, 2013 (the last meeting Plaintiff had with Dr. Richardson) as a result of the warnings and/or concerns regarding his job performance. In fact, Plaintiff received a letter dated April 26, 2013, from President Mullen stating that his salary would be increased effective July 1, 2013.[15] (Dkt. No. 41, Attach. 21.) Accordingly, the Court cannot treat the warnings and criticisms that Plaintiff received as adverse employment actions. The only adverse employment actions that Plaintiff suffered include (a) when he was notified by letter on June 4, 2013, that he was being removed from his position as Dean, and (b) the subsequent reduction of his salary. Therefore, Plaintiff cannot rely on temporal proximity because the seven-month span of time that elapsed between November 2012 and June 2013 is much greater than two months.

In any event, even if Plaintiff could rely on temporal proximity, he would still need to demonstrate that the College's reasons for removing him were a pretext for retaliation. "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext. . . . Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). More specifically, a "plaintiff must present evidence that retaliation was the 'but-for' cause of the action." *Varno v. Canfield*, No. 15-3611, 2016 WL 6584889, at *2 (2d Cir. Nov. 7, 2016).

---

[15]     It is important to note that raises were given to employees "across-the-board," provided that they were "performing at a satisfactory level." (Dkt. No. 45, Attach. 21 [Pl.'s Ex. "21"]; Dkt. No. 41, Attach. 43, at 327:17-23 [Richardson Dep.].)

However, "[r]equiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause." *Kwan*, 737 F.3d at 846 n.5. Instead, Plaintiff may show pretext by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* at 846. Furthermore, "a plaintiff may rely on evidence comprising [his] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* at 847 (citations omitted).

Defendant argues that Plaintiff's poor performance and leadership in his role as Dean led to its decision to remove him. These are legitimate, non-retaliatory reasons for Plaintiff's removal. *See Varno*, 2016 WL 6584889, at *2 ("The defendants demonstrated a legitimate, non-discriminatory reason for terminating Varno: substandard performance."). Although Plaintiff disputes the merit of Defendant's decision, the Court need not address that issue. *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer."); *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985) ("[T]he ultimate inquiry is whether an employee's performance meets his employer's legitimate expectations."); *Moore v. Kingsbrook Jewish Med. Ctr.*, 11-CV-3625, 2013 WL 3968748, at *13 (E.D.N.Y. July 30, 2013) ("[T]he fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.") (internal quotation marks

omitted). However, the Court finds that Plaintiff has failed to create a genuine dispute of material fact regarding whether Defendant's proffered reasons for his removal were pretextual for the following two reasons.

First, President Mullen states in his affidavit that "[t]he key decisive factor in my decision [to remove Plaintiff from his deanship] was his breach of confidentiality of the promotion and tenure review process." (Dkt. No. 41, Attach. 38, ¶ 16 [Mullen Aff.].) President Mullen further stated that "[t]he cumulative effect of Dr. Mello's impaired performance and diminished confidence coupled with the serious breach of confidentiality which in my judgment was the key decisive factor led to my decision to remove him as dean. My decision was based only on Dr. Mello's impaired performance and lack of confidence." (*Id.*, ¶ 18.) Indeed, President Mullen testified at his deposition that he was "very upset" over the incident and described the ordeal as "a very serious mistake." (Dkt. No. 41, Attach. 39, at 92:17, 93:14 [Mullen Dep.].) President Mullen reiterated that he considered Dr. Richardson's concerns regarding Plaintiff's job performance but testified that, "in my judgment, it was the confidentiality that was the key decisive factor" as well as "the presenting reason" for the decision to remove Plaintiff from his position. (*Id.*, at 106:11-12, 107:14-18.)

Significantly, Plaintiff does not dispute that he improperly disclosed information regarding the promotion and tenure review process. In fact, Plaintiff "admitted error and apologized immediately for this to Dr. Richardson and then scheduled a meeting with [President] Mullen immediately upon [his] return from travel later that week to admit error and apologize." (Dkt. No. 41, Attach. 22, at 3 [Def.'s Ex. "T"].) Although President Mullen appreciated Plaintiff's acknowledgment of his mistake, Mullen testified that the incident still occurred "and it

had effects on other people that were, in my judgment, problematic." (Dkt. No. 41, Attach. 39, at 106:12-15 [Mullen Dep.].) Granted, this incident occurred in February 2013 and Plaintiff was not removed until June 2013. However, it is undisputed that the decision to remove Plaintiff was made after commencement in May 2013. Moreover, at most, the delay goes to the emergency presented by Plaintiff's breach, not the decisiveness of that breach as a factor.

Second, Dr. Richardson's concerns regarding Plaintiff's job performance are well documented and it is not disputed that Dr. Richardson expressed these concerns to Plaintiff while warning him to take corrective action over a time period of approximately five months. In addition, Defendant has submitted affidavits from several other employees who personally observed issues with Plaintiff's job performance: specifically, the internal conflicts between Plaintiff and members of the Accounting and Business Law Department. For example, Mr. Dwyer stated that he personally observed "significant tensions and discord between members of the Department and Dr. Mello during his tenure as Dean of the School of Business." (Dkt. No. 41, Attach. 56, ¶ 7 [Dwyer Aff.].) Similarly, Professor Phelan stated that "there was an ongoing absence of harmony between the members of the Accounting Department and Dr. Mello in his role as Dean[.]" (Dkt. No. 41, Attach. 55, ¶ 12 [Phelan Aff.].) Plaintiff also admitted at his deposition that there was "excessive conflict within the accounting department" as well as between the department and himself and that "excessive conflict is tantamount to dysfunction within a department or relationship between a department and a dean[.]" (Dkt. No. 41, Attach. 27, at 93:11-14, 94:5-10 [Mello Dep.].) To address this issue, the College arranged for Dr. Joseph Pastore, an outside party, to intervene and attempt to relieve the tensions between members of the Accounting Department and Plaintiff. (*Id.*, at 92:5-13; Dkt. No. 41, Attach. 41,

¶¶ 16-17 [Richardson Aff.].)  In addition, Dr. Donald Arnold, another outside party, was hired by the College to conduct a review of the school's programs and noted serious relationship problems among some faculty members as well as between the department and Plaintiff.  (Dkt. No. 41, Attach. 44, at 3 [Def.'s Ex. "B" to Richardson Aff.]; Dkt. No. 41, Attach. 45, at 2 [Def.'s Ex. "C" to Richardson Aff.].)

This Court is mindful of the Second Circuit's instruction that "[t]he determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Kwan*, 737 F.3d at 846 n.5.  However, when considered together, this evidence supports Defendant's stated legitimate, non-retaliatory rationale for removing Plaintiff from his position as Dean; and, because Plaintiff acknowledges that at least some of these problems existed, he has failed to demonstrate that Defendant's reasons for his removal are pretexts.  *See McGill v. Univ. of Rochester*, 600 F. App'x 789, 791 (2d Cir. 2015) (stating that, "even when the record is viewed in the light most favorable to plaintiff, no reasonable trier of fact could find that the detailed and consistent concerns with McGill's work performance were merely a pretext for racially motivated adverse employment actions").  Accordingly, Plaintiff's claims under Title VII, the Equal Pay Act, and the NYSHRL must be dismissed.

### E.    Whether Plaintiff's Breach-of-Contract Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons discussed below.

As an initial matter, Plaintiff correctly argues that Defendant failed to make specific arguments in its memorandum of law in support of dismissal of his breach-of-contract claim. Indeed, such arguments appear for the first time in Defendant's reply memorandum of law. Ordinarily, these arguments would not be considered. *See Knipe v. Skinner*, 999 F.2d 708, 710-11 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief."); *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009) (stating that "a district court is free to disregard argument raised for the first time in reply papers, especially on a motion for summary judgment"). However, this Court has discretion to consider them and will do so here. *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005).

It is undisputed that Plaintiff's appointment as Dean was an administrative appointment governed by the *Administrators' Handbook*. Plaintiff's Amended Complaint alleges that, "[w]hile the Administrator's Handbook provides specific situations in which compensation may be reduced for 'Exempt Full-time and Part-time Administrators[,]' there is no mention of a reduction in compensation upon retreating to a faculty position." (Dkt. No. 3, ¶ 55 [Pl.'s Am. Compl.].) It further alleges that, "[b]ased on the provisions of [Plaintiff's] Appointment Letter and the Administrator's Handbook, Dr. Mello reasonably believed that his compensation would not be negatively impacted if he were removed from his position as Dean." (*Id.*, ¶ 56.) Finally, the Amended Complaint alleges that "the provisions of plaintiff's Appointment Letter, together with the referenced Administrator's Handbook, constitute a written, oral and/or implied employment contract with the plaintiff." (*Id.*, ¶ 57.)

Although Plaintiff has failed to cite the specific provisions contained in his appointment letter and/or the *Administrators' Handbook* that he allegedly relied on in forming the belief that his salary would not be reduced in the event that he was removed from his deanship, the Court

has carefully reviewed these materials and has not found any such provision. Significantly, the *Handbook* contains a disclaimer on the third page stating that "New York State is an 'employment at will' state. Therefore, an administrator's employment with Siena College can be terminated at any time for any reason, with or without cause or notice, by him/her or by Siena College." (Dkt. No. 41, Attach. 16, at 4 [Def.'s Ex. "N"].) Moreover, Plaintiff signed an acknowledgment stating that he received a copy of the *Handbook* and that his employment would be at-will. (Dkt. No. 41, Attach. 17, at 2 [Def.'s Ex. "O"].) The acknowledgment further states that "[n]o implied contract concerning any employment-related decision or term and condition of employment can be established by any other statement, conduct, policy, or practice." (*Id.*) Accordingly, Plaintiff's position as Dean was not governed by an employment contract. *See Baron v. Port Auth. of New York and New Jersey*, 271 F.3d 81, 85-88 (2d Cir. 2001) ("[W]here a sufficiently unambiguous disclaimer, conspicuously placed in the employee handbook such that the employee reasonably could be expected to read it is at issue, the totality of the circumstances inquiry is unnecessary; the implied contract claim may be dismissed as a matter of law."); *Wait v. Beck's N. Am., Inc.*, 241 F. Supp. 2d 172, 185 (N.D.N.Y. 2003) (Hurd, J.) ("Moreover, contrary to plaintiff's argument, the Handbook did not merely retain BNA's right to discharge plaintiff at-will, but expressly precluded reliance upon the Handbook as the foundation of *any* right or contract. . . . Accordingly, no contractual relationship, express or implied, was formed.") (emphasis added).

Perhaps most importantly, Plaintiff's appointment letter explains that his salary as Dean was determined by a formal Wage and Classification Program and that, as Dean of the School of Business, he was assigned a pay grade of 14. (Dkt. No. 41, Attach. 15, at 2-3 [Def.'s Ex. "M"].) The letter refers Plaintiff to the *Administrators' Handbook* for more information regarding the

program.  (*Id.*)  The *Administrators' Handbook* states that "[d]ecreases in grade may result in a decrease in salary. . . . Any salary decrease more than 5% must be approved by the President." (Dkt. No. 41, Attach. 16, at 24 [Def.'s Ex. "N"].)  In the absence of any provisions to the contrary, once Plaintiff was removed from his position as Dean, he would no longer have a pay grade of 14.  Plaintiff's salary was therefore decreased to an amount comparable to other tenured faculty members based upon his rank and experience, which was authorized by President Mullen.  (Dkt. No. 41, Attach. 38, ¶ 24 [Mullen Aff.].)  It is also apparent that, once he was removed from his position as an administrator, the *Administrators' Handbook*, as well as its wage guidelines, no longer applied to Plaintiff; rather, the *Faculty Handbook* and its wage guidelines would govern his position as a professor.  (Dkt. No. 41, Attach. 15, at 2-3 [Def.'s Ex. "M"] [stating that the "provisions contained in the *Faculty Handbook* are not applicable to your appointment as Dean of the School of Business"].)  It is true that other deans did not suffer a reduction of salary upon leaving that position but President Mullen explained the reasoning for those decisions, which he felt did not apply to Plaintiff.  (Dkt. No. 41, Attach. 39, at 116:8-120:11 [Mullen Dep.].)

For all of the foregoing reasons, Plaintiff's breach-of-contract claim is dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's second motion for summary judgment (Dkt. No. 41) is **GRANTED**.  The Clerk of the Court is directed to enter judgment in favor of the Defendant and close this case.

Dated: March 14, 2017
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge